## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | |
|---|---|
| **KEITH JONES *et al.*,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION NO. 5:11-CV-398 (MTT)** |
| ) | |
| **TUCKER COMMUNICATIONS, INC.,** ) | |
| **and TIMOTHY TUCKER,** ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

## <u>ORDER</u>

In this action, the Plaintiffs seek overtime compensation for hours worked in excess of 40 hours per week pursuant to the Fair Labor Standards Act ("FLSA").  The Plaintiffs have moved for summary judgment (Doc. 80), and the Defendants have moved for summary judgment (Doc. 96), to dismiss the claims of 136 of the 146 opt-in plaintiffs (Doc. 115), and to decertify the conditionally certified collective action (Doc. 116).  For the following reasons, the Plaintiffs' motion for summary judgment is **DENIED**, the Defendants' motion for summary judgment is **GRANTED**, and the Defendants' motions to dismiss and for decertification are **DENIED as moot**.

## I.  FACTUAL AND PROCEDURAL BACKGROUND[1]

Since its inception in 2002, Defendant Tucker Communications ("Tucker") has been providing services for Charter Communications.  (Doc. 83-11 at 6:6-8, 13:18-14:2).  These services include repairing, installing, disconnecting, or changing the service for Charter customers' cable, internet, and telephone services.[2]  (Doc. 83-11 at 68:13-17, 71:19-

---

[1] The Parties do not dispute these facts unless otherwise indicated.

[2] Charter is Tucker's primary customer, though it provides these services to another cable company to a much lesser extent.  (Docs. 83-11 at 13:21-24; 104 at 10:22-11:6).

72:13).  The work Tucker performs for Charter is done pursuant to a Master Contractor Agreement, which specifies the amount Charter pays Tucker for different services.  (Doc. 104 at 9:21-10:1, 11:25-12:11).  Charter pays Tucker according to this fee schedule as long as Tucker's cable installation technicians meet certain performance standards. (Docs. 83-11 at 119:20-120:8; 104 at 13:4-19, 14:5-15:17; 114 at ¶ 6).

After Charter customers contact Charter to have their cable service repaired or a new system installed, Charter informs Tucker, and Tucker sends a cable installation technician to perform the work.  (Doc. 114 at ¶ 5).  Although Charter decides which technicians get job assignments, Tucker can reassign jobs based on the availability of technicians.  (Doc. 83-11 at 88:13-89:4).  Technicians also have the opportunity to sell additional Charter services to Charter customers while on job assignments.  (Doc. 114 at ¶ 8).

Technicians typically begin the day at their assigned office and load any supplies they may need for the day into their vehicles.  (Docs. 83-11 at 80:22-81:2, 81:12-14; 113 at ¶ 3).  After checking their PDAs for their first job assignment, technicians set an estimated time of arrival ("ETA") to trigger a call to the customer.  (Doc. 83-11 at 81:16-82:8). Technicians record the start time of the job on their PDAs once they are on location. (Docs. 83-11 at 83:5-10; 113 at ¶ 5).  After a job is completed, technicians input the codes for the work performed and close out the job on their PDAs.  If there is another job assigned, they set an ETA for the next job.  (Docs. 83-11 at 93:6-11, 94:8-19; 113 at ¶¶ 5-6).

If technicians have no other jobs assigned or if there is a time gap between jobs, they can select "available" on their PDAs, and a Tucker dispatcher will notify them of jobs that become available during the day.  (Doc. 83-11 at 96:22-98:21).  Alternatively,

technicians may enter "at lunch," "on break," or "not available," in which case they will not be called for additional jobs.  (Docs. 83-11 at 97:15-19; 113 at ¶ 7).

Technicians are paid a set amount for each type of service performed, and Defendant Tim Tucker, Tucker's President and Chief Executive Officer, determines this amount.  (Docs. 83-11 at 20:17-21:3; 104 at 44:6-45:25; 114 at ¶ 7).  The Parties dispute whether Tim Tucker decides what technicians are paid based solely on his experience in the industry or whether he correlates their pay based on the amount Charter pays Tucker for each service.[3]  The Parties also dispute whether the amount technicians are paid generally represents a specified percentage of the amount Charter pays Tucker for each service.[4]  If Tucker's technicians sell additional Charter products or services, they receive the entire amount Charter pays Tucker per the contract, and Tucker receives only an administrative fee.  (Doc. 83-11 at 51:22-53:2).  At the end of each week, technicians

_____

[3] In Tim Tucker's first deposition, he stated, "I paid them based on the industry standard that I was accustomed to, the same way that I had received my pay."  (Doc. 83-11 at 16:21-23).  In that same deposition he responded similarly to questioning:

> Q: But in terms of having discussions with anybody else in the industry, you didn't -- your -- your experience, as I understand it -- your decision to pay them piece rate was based on your own personal experience in the industry?
>
> A: Yes.

(Doc. 83-11 at 31:15-20).  In his second deposition, Tim Tucker stated, "And like I told in the past, our typical pay percentage is 60/40, basically."  (Doc. 104 at 59:3-4).  He stated in his declaration he pays technicians based on "industry standards" and he "decide[s] the percentage of the fee that the cable installation technicians receive based on the amount Tucker Communications, Inc. receives from Charter and my knowledge of how long a particular service will take to perform." (Doc. 114 at ¶ 7).  While not relevant to the disposition of this case, the Court observes that paying based on "industry standard" and paying based on a percentage the cable company pays are not mutually exclusive, and indeed, could be one and the same.

[4] The Parties made charts comparing the amount technicians are paid per service to the amount Charter pays Tucker per service.  Not surprisingly, the examples chosen by the Defendants generally show a uniform percentage, while the examples chosen by the Plaintiffs show greater variation.

submit weekly pricing sheets and summaries of services performed during the week to be processed for payment.  (Doc. 83-11 at 46:4-47:9).

The named Plaintiff, a cable installation technician employed by Tucker, brought this FLSA collective action on behalf of himself and others similarly situated to recover unpaid overtime compensation pursuant to 29 U.S.C. § 207.  The collective class was conditionally certified based on a joint stipulation.  (Doc. 26).  The Plaintiffs have moved for summary judgment, requesting the Court to find: 1) the retail or service establishment exemption to the FLSA's overtime requirement does not apply, 2) the outside sales exemption does not apply, 3) Tim Tucker is also liable to the Plaintiffs because he is an "employer" for purposes of the FLSA, and 4) the Plaintiffs are entitled to liquidated damages as a matter of law.  The Defendants also moved for summary judgment on the applicability of the retail or service establishment exemption to Tucker.  Alternatively, the Defendants moved to decertify the collective action and to dismiss the claims of 136 of the 146 opt-in Plaintiffs.

## II. DISCUSSION

### A.  Summary Judgment Standard

Summary judgment must be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material facts and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "A factual dispute is genuine only if 'a reasonable jury could return a verdict for the nonmoving party.'"  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)).  The burden rests with the moving party to prove that no genuine issue of material fact exists.  *Info. Sys. & Networks Corp.*, 281 F.3d at 1224.  The party may

support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).

"If the moving party bears the burden of proof at trial, the moving party must establish all essential elements of the claim or defense in order to obtain summary judgment."  *Anthony v. Anthony*, 642 F. Supp. 2d 1366, 1371 (S.D. Fla. 2009) (citing *Four Parcels of Real Prop.*, 941 F.2d at 1438).  The moving party must carry its burden by presenting "credible evidence" affirmatively showing that, "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the nonmoving party."  *Four Parcels of Real Prop.*, 941 F.2d at 1438.  In other words, the moving party's evidence must be so credible that, if not controverted at trial, the party would be entitled to a directed verdict.  *Id.*

"If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, 'comes[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact.'"  *Id.* (quoting *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991)) (alteration in original).  However, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. ... The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Thus, the Court "'can only grant summary judgment if everything in the record demonstrates that no genuine issue of material fact exists.'"  *Strickland v. Norfolk S. Ry.*

*Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) (quoting *Tippens v. Celotex Corp.*, 805 F.2d 940, 952 (11th Cir. 1986)).

In contrast, "[w]hen the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim.'" *Four Parcels of Real Prop.*, 941 F.2d at 1437 (quoting *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986)). The moving party "simply may show … that there is an absence of evidence to support the nonmoving party's case." *Id.* at 1438 (internal quotation marks and citation omitted). "Assuming the moving party has met its burden, the non-movant must then show a genuine dispute regarding any issue for which it will bear the burden of proof at trial." *Info. Sys. & Networks Corp.*, 281 F.3d at 1224-25 (citing *Celotex Corp.*, 477 U.S. at 324).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion. *See Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (internal quotation marks and citation omitted). The Court will consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. *See Am. Bankers Ins. Grp.*, 408 F.3d at 1331.

### B.  Section 207(i) Exemption

Pursuant to the FLSA, employers are required to pay employees overtime compensation for hours worked in excess of 40 hours per week at a rate not less than one and one-half times the employees' regular rate unless an exemption applies.  29 U.S.C. §

207(a)(1).  The Parties have cross-moved for summary judgment on the applicability of the exemption for commissioned employees of retail or service establishments found in 29 U.S.C. § 207(i), which provides,

> No employer shall be deemed to have violated subsection (a) of this section by employing any employee of a retail or service establishment for a workweek in excess of the applicable workweek specified therein, if (1) the regular rate of pay of such employee is in excess of one and one-half times the minimum hourly rate applicable to him under section 206 of this title, and (2) more than half his compensation for a representative period (not less than one month) represents commissions on goods or services.

The retail or service establishment exemption has three requirements: 1) the employer must be a "retail or service establishment," 2) the employees' regular rate of pay must be one and one-half times the minimum wage, and 3) more than half of the employees' compensation for the representative period must represent commissions.  Because the Plaintiffs are not contesting the second element, only the first and third elements are at issue.

The employer bears the burden of proving the applicability of an FLSA exemption by "clear and affirmative evidence."  *Birdwell v. City of Gadsden*, 970 F.2d 802, 805 (11th Cir. 1992) (internal quotation marks and citation omitted).  "Exemptions from the overtime provisions of section 207 are to be narrowly construed against the employer."  *Id.* Additionally, exemptions are "to be applied only to those clearly and unmistakably within the terms and spirit of the exemption."  *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1269 (11th Cir. 2008) (internal quotation marks and citations omitted).

The Parties agreed at oral argument that "clear and affirmative evidence" imposes a heightened burden on the employer, requiring proof by more than a preponderance of the evidence, but the Court is not sure this is correct.  The Eleventh Circuit has not addressed the issue, but other circuits have determined there is no heightened evidentiary burden on

the employer.  *See Lederman v. Frontier Fire Prot., Inc.*, 685 F.3d 1151, 1158 (10th Cir.

2012) ("In sum then, just as some courts have mistakenly viewed 'clear and affirmative

evidence' as a heightened evidentiary standard, the same is true with the phrase 'plainly

and unmistakably.'"); *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 501-02

(6th Cir. 2007) ("[W]e have now made it clear that the employer claiming an FLSA

exemption does not bear any heightened evidentiary burden"); *Yi v. Sterling Collision Ctrs.*,

*Inc.*, 480 F.3d 505, 508 (7th Cir. 2007).  Whether heightened or not, the Court concludes

that Tucker has met its burden of proving that the retail or service establishment exemption

applies.

### 1.  Retail or Service Establishment

A "retail or service establishment" is defined as "an establishment 75 per centum of

whose annual dollar volume of sales of goods or services (or of both) is not for resale and

is recognized as retail sales or services in the particular industry."  29 C.F.R. § 779.411.

Though this definition originates from § 13(a)(2) of the FLSA, which was repealed in 1989,

the Department of Labor and the courts are in agreement this definition is still operative.

*See* 29 C.F.R. § 779.24; *see also Reich v. Delcorp, Inc.*, 3 F.3d 1181, 1183 (8th Cir. 1993);

*Russell v. Promove, LLC*, 2009 WL 1285885 at *3 (N.D. Ga.); *English v. Ecolab*, Inc., 2008

WL 878456 at *2 (S.D.N.Y.).

The Parties do not dispute the nature of Tucker's business.  Instead, they disagree

on the legal conclusions to be drawn from the undisputed facts.

### a.  Sales Not for Resale

DOL regulations define sales for resale as those in which "the seller knows or has

reasonable cause to believe that the goods or services will be resold, whether in their

original form, or in an altered form, or as part, component, or ingredient of another article."

29 C.F.R. § 779.331.  Further,

> [I]n certain circumstances, sales of services to a business for a specific use in performing a different service which such business renders to its own customers are in economic effect sales for resale as a part of the service that the purchaser in turn sells to his customers, even though such services are consumed in the process of performance of the latter service.

29 C.F.R. § 779.334.

The Plaintiffs contend Tucker's services are resold because Tucker sells its services to Charter, which then uses them to provide services to its own customers.  They further argue Tucker's services are analogous to mothproofing services used by a storage establishment to provide satisfactory storage to its customers, an example of a service for resale provided in § 779.334.[5]     On the other hand, the Defendants argue Tucker's services are not resold because it provides them directly to the general public, and the fees paid by the end users are passed along to Tucker through Charter only as a matter of convenience.     The Defendants rely on *Owopetu v. Nationwide CATV Auditing Services, Inc.*, 2011 WL 883703 (D. Vt.) [*Owopetu I*],[6] where the court found the services of a cable installation business virtually identical to the one at issue in this case were not being resold:

> Nationwide's provision of cable installation and repair services to TWC customers does not constitute "sales for resale" because there is no

---

[5] The regulation also includes other examples of services constituting sales for resale, such as "an establishment [that] reconditions and repairs watches for retail jewelers who resell the services to their own customers … [and] a garage [that] repairs automobiles for a secondhand automobile dealer with the knowledge or reasonable cause to believe that the automobile on which the work is performed will be sold … ."  29 C.F.R. §779.334.  The mothproofing example is the only one in which the service provided is resold as part of the provision of another service.

[6] There are two *Owopetu* decisions because the court initially determined not enough evidence was in the record for it to determine whether all elements of the retail or service establishment exemption were met.

subsequent sale, that is, no "selling again," after the services are provided. Instead, the customers to whom Nationwide directly provides its services are "at the very end of the stream of distribution," and therefore Nationwide "provides ... its repair services ... for the comfort and convenience of [the general] public in the course of its daily living," as opposed to providing them for redistribution.

*Id.* at *7 (quoting 29 C.F.R. § 779.318(a)).

As an initial matter, there is no indication Tucker has reason to believe its services will be sold again.  Tucker provides its services directly to the end consumer who contracts with Charter for monthly cable or internet service.  As noted in *Owopetu I*, there is no subsequent sale once the services are provided.  *Id.*[7]  Further, the very regulations the Plaintiffs rely on support finding the Defendants' services are not resold.  In no sense are the services Tucker provides consumed in the process of Charter providing services for its customers.  Unlike the mothproofing example in § 779.334, Tucker's provision of repair and installation services is not a mere enhancement of Charter's provision of monthly cable and internet services; it is a discrete and necessary component.  Without Tucker's technicians installing the necessary equipment or repairing deficient equipment, Charter customers would not have access to their monthly services.

Nor are the services Tucker provides analogous to the other examples of services for resale provided in § 779.334.  The installation does not become part of the product sold by Charter as a repaired watch for a jeweler or a repaired automobile for a secondhand car

---

[7] The Defendants focus on the fact that in *Owopetu I* there was no evidence the cable company charged its customers for the installation service.  However, the Plaintiffs point to a sample bill found on Charter's website showing installation fees as a separate charge, to which the Defendants have not objected.  (Doc. 129-1 at 5).  Though the Court does not find this to be determinative, the separate installation charge actually enhances the Defendants' position because it helps demonstrate the services Tucker performs are distinct and not "consumed in the process" of Charter performing its own services.

dealer does but remains a discrete part of the transaction which Tucker provides directly to the end user.[8]   Therefore, the services Tucker provides are not "sales for resale."

### b.  Sale or Services Recognized as Retail in the Particular Industry

Though the second component of the retail or service establishment definition requires 75% of a business's annual dollar volume of sales be recognized as retail sales or services in the particular industry, a business must have a "'retail concept' … before the industry characterization of its sales can be considered."" *Brennan v. Great Am. Disc. & Credit Co.*, 477 F.2d 292, 295 (5th Cir. 1973);[9] *see also* 29 C.F.R. §§ 779.316, 779.322. "Determination of whether a business fits the retail concept is not without difficulty."  *Great Am. Disc. & Credit Co.*, 477 F.2d at 296.  "[A] 'retail concept' cannot be artificially created in an industry in which there is no traditional concept of retail selling or servicing."  29 C.F.R. § 779.316; *see also Idaho Sheet Metal Works, Inc. v. Wirtz*, 383 U.S. 190, 199-201 (1966) (explaining industry usage of the term "retail" is not controlling).

The characteristics of a retail or service establishment in 29 C.F.R. § 779.318(a) help define this "retail concept:"

---

[8] The Plaintiffs also contend Tucker's services are for resale because they are analogous to an example in the Wage and Hour Division of the Department of Labor's Field Operations Handbook: a television service company performing repair services for home users through a contract it has with a television dealer.  Department of Labor, Wage & Hour Division *Field Operations Handbook* § 21ct00(c).  The Handbook further provides the television service company's repair services would not be considered for resale if the contract was between the television service company and the home user, even if "obtained … through the efforts of the television dealers."  *Id.* at § 21ct00(b).  While this Handbook may provide guidance to courts, it is not entitled to *Chevron* deference. *Klinedinst v. Swift Invs.*, 260 F.3d 1251, 1255, 1255n.3 (11th Cir. 2001).  The Court does not find this example persuasive.  The same service is being provided to the same end user in both scenarios.  Additionally, the television dealer procures the contract in both scenarios—the outcome turns solely on whose name is on the contract the home user signs.

[9] The Eleventh Circuit has adopted as binding precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

Typically a retail or service establishment is one which sells goods or services to the general public. It serves the everyday needs of the community in which it is located. The retail or service establishment performs a function in the business organization of the Nation which is at the very end of the stream of distribution, disposing in small quantities of the products and skills of such organization and does not take part in the manufacturing process. … It provides the general public its repair services and other services for the comfort and convenience of such public in the course of its daily living.

It seems beyond doubt that if Charter employees were providing these services to their customers, in addition to providing them with monthly cable and internet services, Charter would be selling the services to the general public, serving the everyday needs of the community, and performing a function at the very end of the stream of distribution.  The Plaintiffs contend Tucker's status as subcontractor for Charter prevents it from meeting these characteristics because it serves Charter, as opposed to the general public. However, as the Defendants note, courts have found a party's status as a subcontractor does *not* alter the retail nature of its business.  *See., e.g., Owopetu v. Nationwide CATV Auditing Servs., Inc.*, 2011 WL 4433159 at *6 (D. Vt.) [*Owopetu II*] ("Nationwide's relationship [as subcontractor for] TWC does not preclude a finding that Nationwide's services are retail."); *Schultz v. Crotty Bros. Dallas, Inc.*, 304 F. Supp. 191, 192, 195-96 (W.D. Tex. 1969) (finding a food service operation contracting with a school to provide meals for its students was a retail establishment); *Wirtz v. Campus Chefs Inc.*, 303 F. Supp. 1112, 1118-19 (N.D. Ga. 1968) (finding identical food service business exempt). The Plaintiffs have not directed the Court to any cases holding businesses cannot qualify for the retail or service establishment exemption solely based on their status as

subcontractors, and the Court has not found any.  This is not surprising; the focus here is

on the nature of the services, not the arrangement between the providers of the services.[10]

Moreover, the fact that Charter might be considered Tucker's customer does not

mean that Tucker does not have the characteristics of a retail or service establishment.

First, "the regulations recognize … the provision of goods and services to commercial

customers does not necessarily prevent an establishment from qualifying as a retail or

service establishment."  *Kelly v. A1 Tech.*, 2010 WL 1541585 at *12 (S.D.N.Y.) (citing 29

C.F.R. § 779.318(b)); *see also Alvarado v. Corporate Cleaning Serv., Inc.*, 719 F. Supp. 2d

935, 944 (N.D. Ill. 2010).  Tucker can still qualify as a retail or service establishment "even

if most of its consumers are businesses, if its sales are not for resale and are recognized in

the industry as retail."  *Collins v. Horizon Training Ctrs., LP*, 2003 WL 22388448 at *7 (N.D.

Tex.) (citing *Mitchell v. Ky. Fin. Co.*, 539 U.S. 290, 294 (1959)).  The Court has already

determined Tucker's sales are not for resale, and the industry characterization of its sales

is discussed below.

In addition, Tucker, even though it contracts with Charter, directly provides its repair

and installation services to the end users—the cable and internet service consumers.

Thus, Tucker operates at the end of the stream of distribution and serves the everyday

needs of the community.  *See Alvarado*, 719 F. Supp. 2d at 944 (finding the ultimate

---

[10] It is also not surprising to the Court that in several cases the "retail concept" of businesses nearly identical to Tucker's has not even been at issue.  *See Moore v. Advanced Cable Contractors, Inc.*, 2013 WL 3991966 at *3 (N.D. Ga.) ("Defendants assert, and Plaintiffs do not dispute, that Advanced Cable is a retail and service establishment for purposes of the FLSA."); *Owopetu II*, 2011 WL 4433159 at *4 ("[The plaintiff] does not dispute that the industry of servicing, installing and repairing cable and broadband equipment has a 'retail concept.'"); *Horn v. Digital Cable & Commc'ns, Inc.*, 2009 WL 4042407 at *4 (N.D. Ohio) (noting defendant cable installation company put forth undisputed evidence that it qualified as a retail or service establishment); *see also Gruchy v. DirectTech Del., Inc.*, 2010 WL 3835007 at *2 (D. Mass.) (noting there was no dispute that company who performed similar services for a satellite television provider was a retail or service establishment).

consumers of the defendant's window washing services were the buildings' tenants and residents even though the buildings were the defendant's customers); *Schwind v. EW & Assocs.*, 371 F. Supp. 2d 560, 566 (S.D.N.Y. 2005) (finding the fact that the defendant provided computer training services to both its business clients and its clients' customers immaterial because in both cases the defendant was providing a service to the end customer).

The Plaintiffs contend Tucker does not meet the everyday needs of the community because "[t]he general public's needs are cable television, telephone, or internet services," and Tucker merely provides repair and installation for companies that provide these services to the general public.  (Doc. 81 at 8).  However, DOL regulations describe a retail or service establishment in part as "provid[ing] the general public its repair services and other services for the comfort and convenience of such public in the course of its daily living."  29 C.F.R. § 779.318.  This describes precisely what Tucker does.  It provides installation and repair services to the general public—cable and internet users—for their comfort and convenience.  Certainly both the provision of internet and cable services and the necessary installation and repair of these services meet the everyday needs of the community.  This is especially true given the partial list of retail or service establishments contained in the regulations, which includes automobile repair shops, fur repair and storage shops, and piano tuning establishments.  *See* 29 C.F.R. § 779.320.  If fur repair and piano tuning meet the everyday needs of the community, surely cable installation and repair does as well.  *Cf. Reich v. Cruises Only, Inc.*, 1997 WL 1507504 at *4 (M.D. Fla.)

(finding a business that helps customers select cruise services meets the everyday needs of the community in part because of the examples contained in the regulations).[11]

Finally, Tucker disposes of its services in small quantities and does not take part in the manufacturing process.  Though the Plaintiffs characterize Tucker's services as wholesale, wholesale establishments generally "exclude the general consuming public as a matter of established business policy," such as where "a purchaser contracts for the purchase of a large quantity of goods or services to be delivered or performed in smaller quantities or jobs from time to time as the occasion requires." 29 C.F.R. § 779.328(a), (c). Three other district courts have determined the retail/wholesale distinction is inapplicable to the § 207(i) exemption because "29 C.F.R. § 779.328 'dealt with the distinction [between retail and wholesale] as it related to the § 13(a)(2) exemption,' an exemption that was 'contingent on the size of the establishment and the types of transactions in which it engaged,'" and "'[t]he retail/wholesale distinction does not serve the same purpose for the application of the § 7(i) exemption, which focuses on the employee's compensation rather than the employer's size or business plan … .'" *Alvarado*, 719 F. Supp. 2d at 945

---

[11] The Plaintiffs also characterize Tucker's business as construction, which lacks a retail concept. *See* 29 C.F.R. § 779.321(c).  However, the sources the Plaintiffs cite are the Standard Industrial Classification System, the North American Industrial Classification System, and a DOL investigator's report finding a business like Tucker was properly characterized as construction based largely on the NAICS classification.  (Docs. 83-1; 83-7; 83-8).  Because of the vastly different concerns and focuses of these classification systems and the FLSA's overtime provisions, the SIC and NAICS's classification of "cable television hookup contractors" as part of the construction industry has little relevance in the FLSA context.  The purpose of the SIC is to collect and analyze economic data, and the NAICS was later implemented to replace the SIC.  *See Cal. Sportfishing Prot. Alliance v. Shamrock Materials, Inc.*, 2011 WL 5223086 at *7 (N.D. Cal.) (quoting Office of Management and Budget, Standard Industrial Classification Manual (1987)); *Ceres Envtl. Servs., Inc., v. United States*, 52 Fed. Cl. 23, 34 (2002).  In contrast, the purpose of the FLSA's overtime requirement is to "(1) spread out employment by placing financial pressure on the employer to hire additional workers rather than employ the same number of workers for longer hours; and (2) to compensate employees who for a variety of reasons worked overtime." *Klinedinst*, 260 F.3d at 1256n.4.

(alterations in original) (quoting *English*, 2008 WL 878456 at *14, *3); *see also Owopetu II* 2011 WL 4433159 at *6 (reaching the same conclusion).[12]

While the Court finds these cases persuasive, Tucker does not fit the characteristics of a wholesale establishment regardless of whether the retail/wholesale distinction is relevant to the § 207(i) exemption.   Again, Tucker provides its services at the end of the stream of distribution, which is consistent with what the regulations characterize as a "retail" transaction and at odds with their characterization of a "wholesale" transaction. *See* 29 C.F.R. § 779.328(a) ("Typically, retail sales are made to the general consuming public.  The sales are numerous and involve small quantities of goods or services. Wholesale establishments usually exclude the general consuming public as a matter of established business policy … .").

Because Tucker has a "retail concept," the next inquiry is whether its services are recognized as retail within the particular industry.  The relevant considerations are "the well-settled habits of business, traditional understanding and common knowledge."  29 C.F.R. § 779.324.  "These involve the understanding and knowledge of the purchaser as well as the seller, the wholesaler as well as the retailer, the employee as well as the employer, and private and governmental research and statistical organizations." *Id.*

The Defendants submitted the affidavit of Michael Dyer, the President and Chief Executive Officer of the Greater Macon Chamber of Commerce and the former Vice President and General Manager of Cox Communications in Macon, Georgia.  (Doc. 111).

---

[12] The Plaintiffs contend these courts are not giving proper deference to the DOL's regulations and cite *Falken v. Glynn County* for the proposition that all DOL regulations are entitled to *Chevron* deference.  197 F.3d 1341 (11th Cir. 1999).  *Falken* addressed the regulations relating to the overtime exemption in 29 U.S.C. § 207(k) for employees engaged in "fire protection activities."  *Id.* at 1345-46.  However, as the court in *English* points out, the interpretive bulletin in which the regulations relevant to the retail or service establishment exemption are contained states *Skidmore* deference should apply.  *See* 29 C.F.R. § 779.9 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)).

Based on his experience in the cable industry, Dyer identified the following services cable installation companies perform that are considered "retail" in the industry: "the sale of cable installation services and equipment to individual consumers and the installation services performed by technicians by delivering, installing or servicing the equipment purchased or leased by the customer and activating or maintaining the customer's connection to the cable company's cable service."  (Doc. 111 at ¶ 4).  In contrast, "laying or stringing cable to access a new housing development or an area previously not served by cable" and "mapping, drafting, and design services for new builds, overbuilds or upgrades" are services cable installation companies perform that are not considered "retail" in the industry.  (Doc. 111 at ¶ 3).  This is because "[s]uch services are for the direct benefit of the cable company, rather than for the comfort and convenience of the end user."  (Doc. 111 at ¶ 3).

Additionally, the Defendants cite *Owopetu II* in support of finding Tucker's services are considered retail in the industry.  The defendant in *Owopetu* submitted two affidavits showing services performed by a cable installation company were considered "retail" in the industry: the affidavit of the defendant's Corporate Office Manager, who was also a member of the Society of Cable Telecommunication Engineers and whose opinion is virtually identical to Dyer's,[13] and the affidavit of a certified professional vocational

---

[13] The affiant

> [A]vers that Nationwide's service technicians, who are employed to "install and service cable television, telephone and broadband internet packages for customers of cable service providers such as ... [TWC]," are "employed in an enterprise that is recognized as retail in the industry."  [She] contrasted the services that Nationwide technicians provide with "laying or stringing cable to access a new housing development or an area previously not served by cable," which is not recognized as retail.

*Owopetu II*, 2011 WL 4433159 at *5 (internal citations omitted).

rehabilitation consultant who found the job of "service technician … fall[s] within the generally-recognized and accepted definition of retail sales occupations."  *Owopetu II*, 2011 WL 4433159 at *5 (internal quotation marks and citation omitted).

The Plaintiffs criticize the basis of Dyer's opinion because he does not have knowledge of the FLSA and did not consult anyone else in the industry prior to giving his opinion.  However, nothing in the regulations or the cases suggests those in the industry must consult either of those sources before giving their opinion.  Further, because the regulations refer to the "well-settled habits of the business" and "common knowledge" as touchstones for whether services are considered "retail" in the industry, it would seem incongruous to require those giving their opinions to consult outside sources beforehand. *See* 29 C.F.R. § 779.324.  Dyer's affidavit is also similar to evidence other courts have considered in determining whether a business's particular activities are considered "retail" within the industry.  *See, e.g.*, *La Parne v. Monex Deposit Co.*, 714 F. Supp. 2d 1035, 1042 (C.D. Cal.) (considering affidavits of former employees as well as an expert affidavit); *Horizon Training Ctrs.*, 2003 WL 22388448 at *8 (considering an affidavit of the defendant's President).

The Plaintiffs also contend word-usage in the industry is not determinative of whether a business is recognized in the industry as "retail."  While they are correct, this is precisely the reason for determining whether a business has a "retail concept" before the industry characterization is considered.  This does not mean the industry view is insignificant.  As the former Fifth Circuit observed, "[a]lthough some legislators, in discussing the 1949 amendment to Section 13(a)(2), expressed concern that the amendment would permit each industry to decide for itself whether or not its sales were retail, it was pointed out that the only proper background for defining a retail or service

establishment in a particular industry is the understanding of the people dealing in that industry as to what constitutes retail services or sales." *Acme Car & Truck Rentals, Inc. v. Hooper* 331 F.2d 442, 446 (5th Cir. 1964).[14]

The Parties do not dispute that Tucker's technicians install, service, and repair equipment for Charter's customers in connection with their cable, internet, and telephone services. (Doc. 83-11 at 68:13-17, 71:19-72:13). Because these services fall within the category of services Dyer and the affiants in *Owopetu II* list as being considered retail, the Defendants have demonstrated Tucker's services are considered retail in the industry. Further, the Plaintiffs have not shown the existence of a triable issue of fact regarding the industry view.[15]

### 2. More than 50% of Compensation Represents Commissions

Whether a particular payment system constitutes commissions is an issue of law. *Klinedinst v. Swift Invs., Inc.*, 260 F.3d 1251, 1254 (11th Cir. 2001). As with most other aspects of this case, the Parties' disagreement is not with the relevant facts but rather with their proper legal characterization. The Plaintiffs contend Tucker's technicians are paid "piece rates," whereas the Defendants maintain they are paid "commissions."

In *Klinedinst*, the Eleventh Circuit held a payment system where automobile painters were paid based on a predetermined number of "flag hours" multiplied by an

---

[14] The 1949 amendments to § 13(a)(2) "overr[ode] the prior judicial determinations that retail sales were only those made to private consumers for their own personal use ... [and] provided that sales to businesses which were not sales for resale might qualify as retail sales." *Rachal v. Allen*, 376 F.2d 999, 1003-04 (5th Cir. 1967).

[15] For the first time at oral argument, the Plaintiffs urged the Court to consider the SIC and NAICS classification systems in determining whether Tucker's business is considered "retail" in the industry based on the language in 29 C.F.R. § 779.324 that the understanding of "private and governmental research and statistical organizations" is relevant. However, the Court finds these classification systems not helpful to the determination of whether Tucker's services are considered retail in the industry for the reasons discussed previously. *See supra* note 11.

hourly rate constituted commission-based payment because it "(1) provides workers with an incentive to work quickly, while (2) paying them at a rate that exceeds minimum wage." 260 F.3d at 1256.  While these "flag hours" were based on time estimates, employees received the same amount of compensation regardless of the actual time it took to complete the jobs.  *Id.* at 1254.  The court focused on how the payment system incentivized employees "to work efficiently and effectively to the benefit of the employer, who may then take on more customers at a greater profit margin, and the employee, who reaps the benefits of increased flag hours regardless of the actual time worked."  *Id.* at 1256.

Though each side contends *Klinedinst* supports its position, the Court finds Tucker's technicians are paid commissions.  Tucker's compensation system is indistinguishable from that in *Klinedinst* in the most important respect: both are incentive-based.  Because Tucker's technicians were paid a set amount per task, the length of time they took to complete jobs did not determine their compensation.  It is also clear technicians had the opportunity to pick up additional jobs during the day by entering "available" on their PDAs, and the Parties do not dispute that technicians who complete many jobs during a given week can earn thousands of dollars, whereas technicians completing relatively few tasks in a week will earn considerably less.  (Doc. 112 at ¶ 9).  Additionally, in a recent case from the Northern District of Georgia, the court found that a compensation system almost identical to Tucker's constituted a commission-based system, declaring it "significantly similar" to the one at issue in *Klinedinst.  Moore v. Advanced Cable Contractors, Inc.*, 2013 WL 3991966 at *5 (N.D. Ga.).

The Plaintiffs argue technicians cannot earn more by working faster because Charter dictates the work, and there is a fixed amount of work.  Even if this is true,

technicians who have finished their assigned jobs will necessarily be able to get a greater share of the available work.  The fact that jobs arise during the day and need to be assigned is not disputed.  Further, the Court is unconvinced the pool of work is so "fixed" that Tucker would be unable to benefit from technicians being able to take on more jobs.  The record shows Tucker competes with other cable installation companies for Charter's installation and repair needs, and the Plaintiffs have not disputed this.  (Doc. 83-11 at 28:20-29:11).

While, as noted above, the Parties disagree whether the amount of compensation technicians receive from Tucker generally represents a specific percentage of the amount Charter pays Tucker, this is not material.[16]  The court in *Moore* found "[p]roportionality between an employees' wages and an employers' gains is an important part of a commission-based compensation system, but to say that any compensation system which does not pay an employee a direct percentage of their employers' gain is not commission-based is too narrow of a construction."  2013 WL 3991966 at *5.[17]  Indeed, *Klinedinst* focused on how the payment system incentivized employees to work more "efficiently and effectively," making no mention of whether the amount paid to the employees was proportional to (let alone a direct percentage of) the amount charged to the customer.

---

[16] Nor is it necessarily a fact since the Parties are simply interpreting the same underlying numerical data differently.

[17] Nonetheless, the court ultimately concluded incentive-based compensation schemes, such as the one at issue in this case, are proportional to the amount received by the employer:

> The incentive of being paid a flat rate for work regardless of how long it takes presumably increases efficiency, which would increase the number of customers the employer can serve. This in turn increases the amount of work available to employees, so their prospective potential earnings are still proportional, although not as an exact percentage, to their employers' potential earnings.

*Moore*, 2013 WL 3991966 at *5.

Thus, proportionality does not seem to be required for a payment plan to constitute commissions in the Eleventh Circuit.

The Plaintiffs place great weight on Tim Tucker's reference to technicians' compensation as "piece rate" throughout his deposition.  Because the characterization of a particular payment method as commissions is an issue of law, the word Tim Tucker used to describe how Tucker's technicians are paid is irrelevant.  Certainly the Plaintiffs would take issue if Tim Tucker said technicians were paid "commissions."  Further, allowing an employer to self-characterize its method of compensation in order to avoid paying overtime compensation would fly in the face of the purpose behind the FLSA.[18]

Because the payment system at issue is similar to the ones in *Klinedinst* and *Moore* in that it incentivizes employees to work more efficiently and effectively to the benefit of both the employee and the employer, the Court finds the Defendants have shown this component of the retail or service establishment exemption is met.

### III. CONCLUSION

The Court concludes the Defendants are exempt from paying overtime pursuant to 29 U.S.C. § 207(i).  Therefore, it is unnecessary to determine the applicability of the outside sales exemption or whether Tim Tucker is an employer for purposes of the FLSA.  Because there has been no violation of the FLSA overtime provisions, the Plaintiffs are not entitled to liquidated damages.

---

[18] In conjunction with their argument Tucker's business is properly characterized as construction, the Plaintiffs also contend several DOL press releases filed as exhibits show a unified DOL policy with respect to "numerous other installation companies that pay their employees piece rate." (Docs. 136 at 8; 83-2 to 83-6).  These press releases show certain companies have agreed to pay their employees back wages after DOL investigations (with one exception where the DOL filed suit) but have only sparse details about the investigations themselves or the underlying facts.  Further, two of the press releases involve misclassification of employees as independent contractors, which is a separate issue from an employer claiming the retail or service establishment exemption.  Therefore, the Court finds they are not relevant to this case.

The Defendants' motion for summary judgment is **GRANTED**, and the Plaintiffs' motion for summary judgment is **DENIED**.  Consequently, the Defendants' alternative motions for decertification and to dismiss 136 of the 146 opt-in plaintiffs are **DENIED as moot.**

**SO ORDERED,** this the 18th day of November, 2013.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT